No. 22,243.

LACITA ALISE BROQUET, *Appellant,* v. THE NORTON INVESTMENT COMPANY et al., *Appellees.*

SYLLABUS BY THE COURT.

WILL—*Devise to Certain Children—Plaintiff Not One of Devisees.* In an action for a share of the property devised to the living children of one of the testatrix's sons, it is held that the evidence fails to show that the plaintiff was his daughter.

Appeal from Norton district court; WILLIAM S. LANGMADE, judge. Opinion filed December 6, 1919. Affirmed.

*T. A. Milton,* of Kansas City, *I. M. Mahin, F. W. Mahin,* both of Smith Center, *A. L. Drummond,* of Norton, *Robert Stone, George T. McDermott,* and *H. O. Caster,* all of Topeka, for the appellant.

*R. W. Hemphill, R. W. Hemphill, jr., L. H. Wilder,* all of Norton, and *I. J. Ringolsky,* of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

MASON, J.: About 1870 Ernest Broquet came to this country from Belgium. In 1873, shortly before settling on a ranch in Norton county, Kansas, he was married to Mary Blue. Five children were born of this marriage. About 1883 his mother came to this country and settled in Norton. She died April 18, 1907, leaving a will executed March 27, 1905, by which her son Leon was to have half of her real property in this country, and the remaining half was to be divided equally among the living children of her son Ernest, who had died in 1905. The five children referred to all survived her. They conveyed their interest in the real estate in Norton county to the Nor-

ton Investment Company, a corporation.  On July 26, 1917, an action was brought in the district court of Norton county against that company by a plaintiff styling herself Lacita Alise Broquet, to recover an interest in this land, and $24,000 as rents and profits, on the ground that she was a daughter of Ernest Broquet.  Judgment was rendered against her, and she apppeals.

Findings of fact were made, which concluded with the statement that the trial court was unable to find from a preponderance of the evidence that the plaintiff was the child of Ernest Broquet.  Unless this court reaches a different conclusion on this issue (the evidence there'n being substantially all in the form of depositions) no other question need be considered. The decision of the trial court is entitled to great we'ght, but is not absolutely controlling.  (*Belknap v. Sleeth,* 77 Kan. 164, 93 Pac. 580.)

It was shown, and was not disputed, that on May 22, 1895, Ernest Broquet obtained a divorce from his wife, in Edwards county, and on July 1, 1895, was married in New York city to a woman described in the certificate as Marineti Atero de Romero, from whom he was divorced in Kansas City, Mo., on February 3, 1898.  The plaintiff claims to have been born of this marriage on November 8, 1896.  Ernest Broquet was remarried to his first wife November 14, 1901.  The real name of his second wife was Sarah Malissa Tevis.  In the home of her mother, Mrs. Lora Tevis, in Kansas City, the plaintiff was reared, having been generally known as Gertrude Tevis, and having been introduced by Mrs. Tevis as her daughter.  The plaintiff testified that she had never adopted the name Broquet —had never come out and claimed to be a Broquet—until she brought this suit.

The plaintiff's claim that Broquet was her father was supported by the direct testimony of the second Mrs. Broquet, supported by her own evidence and that of relatives and friends to the effect that such had been their understanding. One witness outside of the family testified that while the plaintiff was a little child he had heard Broquet say she was his daughter.  A dentist testified that when she was about four years of age Broquet had brought her to him for some work.  The defendant introduced evidence tending to identify

the plaintiff with a granddaughter of Mrs. Lora Tevis, born
in 1892, who was known as Herbie (or Herba) Tevis and
sometimes as Gertrude Tevis, but who was enrolled in a school
as Mary G. Tevis.   The defendant made an effort to show
that the plaintiff was in fact several years older than she
represented, a matter that was important, not only because of
supporting its theory of her identity, but because Mrs. Bro-
quet testified that she had first met Broquet several weeks
before their marriage, so that if the plaintiff was born as much
as a year before the date she assigns she could not have been
the daughter of Broquet.   An entry of her birth was said to
have been made in a family record which was destroyed by
fire.   The absence of any school record was accounted for by
the statement that she had received instruction only from
private tutors.   A witness for the defendant said that in 1905,
in taking a school census he had entered the plaintiff's age at
15, his memory being that she was personally present at the
time.   On the issue of her age the plaintiff was corroborated by
a number of witnesses whose good faith there is not the
slightest reason to doubt, and who saw her when she was
young enough so that her appearance would indicate her age
within a year or so with reasonable certainty.   But, on the
other hand, evidence to the contrary was given by witnesses
for the defendant, whose veracity there is likewise no reason
to question, and who also had opportunity for observation
many years ago.   No explanation was offered of the failure to
produce evidence of the date of the plaintiff's birth from a
public record.

If this were all the evidence, there would be difficulty in
reaching a satisfactory solution of the question of fact.   Doubt-
less the circumstance that ten years was allowed to elapse
between the death of Broquet's mother and the assertion of
the plaintiff's claim is a matter to be considered, not only as
having a tendency to suggest a suspicion of its good faith, but
as increasing the difficulties of the defendant in ascertaining
and showing the real facts on which the case turns.   Of these
facts Mrs. Broquet alone of all the witnesses produced has
actual knowledge, so that anything throwing light upon the
weight that should justly be given her evidence is of the first
importance.   That the obligation of her oath rested somewhat

lightly upon her is shown by the manifest falseness of some of her statements in minor matters. For illustration, she swore at one time that she was born in Brazil, and at another that she was born in Spain, the Spanish dancer Carmencita being her aunt; whereas, in fact, she was born in Indiana. Her story, upon which the claim of the plaintiff must ultimately rest, is discredited in its vital parts by circumstances not as yet referred to, but now to be stated. Her decree of divorce from Broquet and her testimony on which it was based were introduced in evidence. Neither contains the slightest suggestion of there having been a child of the marriage. It is difficult to believe that if her present story were true she would have failed to mention the child and ask for its custody, especially as she professes to have been apprehensive that Broquet would kidnap it. In the divorce case she swore positively that she had lived with Broquet for only three months after her marriage—until October 3, 1895; that he then said he would never live with her any more, and left her; and that she had not lived with him since that time. These statements, if true, are of course utterly destructive of the plaintiff's case.

After the issue as to the plaintiff's age had been partially developed by the taking of depositions in behalf of the defendant, and a group photograph taken in 1899 had been produced in which was included the picture of the girl Herbie (or Herba) or Gertrude Tevis, with whom it was sought to identify her, a witness for the plaintiff living in Chicago, who testified very strongly for her in other respects, produced what she and Mrs. Broquet swore was a photograph of the plaintiff, taken in 1897. It showed a baby about a year old, sitting in a collapsible baby carriage or cab. The card on which the picture was mounted had been roughly cut off close to the photograph itself, an act for which no explanation was offered, but which probably had the effect of detaching the name of the photographer. Mrs. Broquet said she was unable to remember with certainty in what city the picture had been taken. A witness called by the defendant testified that he was and had been for about eight years the trustee and licensor for patents for collapsible baby carriages, and was a salesman for and a stockholder in the company which was the original manufacturer of them, beginning in 1906; that there were no collap-

sible baby cabs on the market prior to 1904; that the cab shown in the picture was made by his company; and that cabs of that model were first manufactured and marketed in 1908. This testimony was fully corroborated by that of the assistant treasurer of the company. If it was untrue, it would seem that evidence to the contrary could have been readily obtained, and none was offered. If it was true, and there seems no intrinsic reason to doubt it, it convicts the witness upon whose word the whole fabric of the plaintiff's case must necessarily rest of deliberate perjury on the vital issue.

The plaintiff's paternity is the more open to question from the circumstance that while on the stand Mrs. Broquet stated that she had had two other children, each born out of wedlock, one before the plaintiff's birth and one after, neither being the child of Broquet. In order that the judgment may be affirmed it is not necessary that the plaintiff's paternity be determined, or that Broquet be proved not to have been her father. It is enough for the purpose if, as the trial court found, the plaintiff's claim of being his child shall lack the support of a preponderance of the evidence. In view of the successful and striking impeachment of the witness upon whose story the claim is based, we are led to the conclusion that there is no preponderance of evidence in its support.

Several matters were brought out in the evidence to which we have omitted reference because they are regarded as of minor importance and because their bearing could be made to appear only by considerable elaboration, which, by making the statement more intricate, might have the effect of obscuring rather than clarifying the issues. It is our view, however, that the net effect of this evidence is to strengthen the defendant's case, rather than that of the plaintiff.

The plaintiff contends that the defendant is bound by the evidence of Mrs. Broquet and two relatives contained in their depositions which were introduced by it. The rule that a party may not impeach his own witness does not go so far as to prevent his contradicting and thereby discrediting the testimony of a witness called by him. (*Deering v. Cunningham,* 63 Kan. 174, 65 Pac. 263.)

The judgment is affirmed.