## No. 31,626

CHARLES D. CUTHBERT and W. E. SUEHRK, Partners, doing business as CUTHBERT & SUEHRK, *Appellees*, v. WILLIAM FORTUNE et al., *Appellants*.

(32 P. 2d 448.)

Opinion filed May 5, 1934.

*W. F. Challis* and *D. C. Hill*, both of Wamego, for the appellants.

*M. A. Bender* and *Minnie M. Banks*, both of Holton, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by plaintiffs to recover for services rendered as architects for the school district under the following contract, which was signed by the members of the board and the plaintiffs:

"This agreement, made this 14th day of March, 1930, by and between Cuthbert and Suehrk, architects, parties of the first part, of Topeka, Shawnee county, in the state of Kansas, and school board of the Louisville rural high school, parties of the second part, of Pottawatomie county, in the state of Kansas.

"Witnesseth, That said parties of the first part, for the consideration hereinafter mentioned, covenants and agrees with the said parties of the second part to furnish preliminary drawings of floor plans and pictures of the building, cuts of same for newspaper publicity and agrees to meet with the board and citizens of the district and help board wherever possible to put over a successful bond election. If the bonds are voted the parties of the second part agree to employ parties of the first part as the architects for the new building at the standard rate of the architects in the state of Kansas of 3 per cent of the cost of the building for preparing plans, details, specifications, letting of all contracts and visits every two weeks to the building during construction. If the bonds are not voted the party of the second part shall pay nothing to the party of the first part.

"In witness whereof, the parties to these presents have hereunto set their hands, the day and year first above written."

"(Signed) LOUISVILLE HIGH SCHOOL BOARD.

By HENRY MARTIN,

ED SULLIVAN,

C. E. KLINGENSMITH.

"CUTHBERT AND SUEHRK,

"By CHAS. D. CUTHBERT."

A preliminary and important question in the case is the validity of the contract. It is alleged and urged that it requires the plaintiffs, who are nonresidents and not electors of the district, to do acts recognized to be detrimental to the public interest and contrary to public welfare and policy. The contract, as will be observed, is dependent on the success of a bond election. Besides preliminary plans of the project, it was agreed between the plaintiffs and the board that they should help the board wherever possible to put over a successful bond election. It was stipulated that if the bonds were voted, the board agreed to employ and pay three per cent of the cost of the building for the services, which were to prepare plans, specifications and details, including the letting of contracts, and should visit the building every two weeks during its construction. It was then specified that: "If the bonds are not voted, the party of the second part shall pay nothing to the party of the first part."

The first and a very important part of the contract was the carrying of the bond election. Plaintiffs agreed to do everything they could to carry that election. It is argued that such a provision in public building contracts is not uncommon and that architects com-

monly contribute such services by giving advice, showing plans of the proposed building and do what they can to promote the success of the election. Plaintiffs say they did little but make exhibits, preliminary plans and pictures of the proposed building. It appears that during the campaign preceding the election, a meeting of the citizens of the school district was held to promote the success of the bond proposition. Plaintiff Cuthbert was asked by the board to attend the meeting and make a speech to the citizens there, and he did attend and made the talk. He testified that he wanted the job, wanted the bonds to carry, and therefore did the things mentioned. The agreement to help the board in securing the success of the bond election necessarily affected public interest and public rights, and the actions of the plaintiffs thereunder, we think, are contrary to public policy and invalidate the contract.

In the early case of *Haas v. Fenlon*, 8 Kan. 601, the principle was announced that a contract made under the inducement of procuring the appointment of another party to a public position was invalid, and that no matter how much one party was damaged by false representation on the matter, nor how much plaintiff was damaged by confiding in such representations or promises, he cannot recover for the injury. In deciding the case Chief Justice Kingman remarked that—

"All contracts that embrace stipulations, or are based upon an understanding, that one party is to exert his influence upon the appointment of a public officer, or upon the decision of questions affecting public rights, with a view to other considerations therefor than the public good, are contrary to public policy, and so inoperative and void."

In *Deering v. Cunningham*, 63 Kan. 174, 65 Pac. 263, a contract was made by which a party agreed with another to aid the latter in securing the granting of a pardon from the governor for a member of his family. Certain notes were given and an action was brought on these where the validity of the contract was questioned, and it was held that the agreement contravened public policy and was void. It was held that while a pardon may be properly applied for, the purchase of personal influence to obtain a pardon or to control the operation of any department of the government is immoral and pernicious and cannot receive the sanction of the courts. The claim that no wrong was intended or actually done had little weight in the decision, and this claim was met in the United States supreme court where it was said in *Tool Company v. Norris*, 69 U. S. 45, that

the invalidity of agreements did not depend upon questions whether improper influence was intended or used, but rather upon the corrupting tendency of such agreements. Mr. Justice Field remarked:

"It is sufficient to observe, generally, that all agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation by refusing them recognition in any of the courts of the country." (p. 56.)

See, also, *Wildey v. Collier and Wife,* 7 Md. 273; *Clippinger v. Hepbaugh,* 5 Watts & S. 315; *Oscanyan v. Arms Co.,* 103 U. S. 261, and other cases cited in *Deering v. Cunningham,* supra.

Plaintiffs say they prepared plans, and pictures were made to illustrate and inform the people of the kind of building projected by the board, but these nonresident architects agreed to do more than that. They promised to help the board wherever possible to put over a successful bond election. They did help and they secured the job of preparing permanent plans and specifications, and did other things. They promised supervision of the work while the building was under construction, but the work did not start on account of the litigation as to the validity of the contract, and now they ask payment for the services rendered.

Even if some of the things done by them prior to the election were valid, the contract was tainted by the illegal part of it, and if the services rendered are partly those of an attorney and partly those of a lobbyist and blended together as part and parcel of a single employment, the entire contract is vitiated, and it has been held in *McBratney v. Chandler,* 22 Kan. 692: "That which is bad destroys that which is good, and they perish together."

The contention of plaintiff is that such arrangements with architects are usual in contracts for buildings dependent upon public elections in almost every case of a letting. But this practice, if common, should be discontinued. We think the contract involves elements which vitiate it, and, being so, it must be held to be void and unenforceable.

As the contract is the foundation of the action, there is no occasion to consider questions relating to the source from which pay-

ment might have been made if the contract had been valid, nor the status of accounts between the old and the new district.

The judgment is reversed with the direction to enter judgment for defendant.

DAWSON, J. (dissenting): Where the electors of a taxing district are called to vote on a proposition to issue bonds for the erection of a public building there is no practical way of advising them on the matter requiring their decision except by the preparation of tentative architectural plans and estimates, and it is both sensible and customary to have these prepared and submitted by an architect who hopes to be employed if the bonds carry, and he prepares and makes such preliminary plans and estimates with full understanding that such preliminary services are not to be paid for. I see nothing wrong in such a practice. Certainly he does not deceive the electors with his tentative drafts and estimates nor by explaining what the electors can expect for their money if the election is carried. Indeed, I think he thus performs a valuable and useful service to the district whether the bonds are carried or defeated. But if there were some theoretical vice in this most common and familiar practice of architects, it ought not to defeat plaintiff's claim for the services he performed after the bonds were carried. Nothing is better settled in the law of contracts nor in the decisions of this court than the rule that a contract, part of which may be repugnant to law and against public policy, a part not being so, may be divided, and so much as is unexceptionable enforced. (*Fackler v. Ford*, McCahon, 21; Restatement, Contracts, §§ 600, 603.)

Passing that point, it seems to me that when the trial court made a finding that at and prior to its consolidation with rural high-school district No. 9, the original defendant high-school district No. 1 was indebted to plaintiff in the sum of $975, the later consolidated district No. 9 being in court and participating in the litigation, the failure of the court to enter judgment for that amount against the latter district was merely an obvious inadvertence which could and should be corrected by a *nunc pro tunc* order to conform to the actual finding of the court. (*Plummer v. Ash*, 90 Kan. 40, 133 Pac. 157.) I therefore dissent.